**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES A. TOLAND**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 12-cv- 01663 |
| | ) | |
| **CAROLYN W. COLVIN**,[1] | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Nov. 25, 2013

**I.     Introduction**

Charles A. Toland ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied his application for supplemental security income ("SSI") and disability insurance benefits ("DIB") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-403, 1381-1383(f).

**II.     Background**

**A.     Facts**

Plaintiff was born on March 1, 1972, making him 34 years old as of his alleged onset date.  (R. 114).  He is considered a "younger individual" under the Regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).   Although Plaintiff left school after the seventh grade, he obtained a

---

1.     Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 24(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue, as the Defendant in this suit.  No further action needs be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

GED in 2000. (R. 143). He has past relevant work experience as an auto mechanic/car dismantler, amusement ride operator, cabinet inspector, lumber stacker, roofer helper, and sander. (R. 146).

Plaintiff alleges disability as of May 1, 2006, due to arthritis, hip spurs, and knee and back pain. (R. 138). The record reflects that Plaintiff has not engaged in substantial gainful work activity since July 31, 2004, when he stopped working because of "family considerations." (R. 138). He was last insured for purposes of DIB on June 30, 2008. (R. 23).

Plaintiff has a fairly limited record of treatment for his alleged impairments, consisting mainly of visits to his primary care physicians with allegations and complaints of back pain for which he received pain medications. The alleged impairments were apparently triggered by a motorcycle accident on May 21, 2005. (R. 188). After the accident, Plaintiff was taken to the emergency room ("ER") at Ruby Memorial Hospital, complaining chiefly of chest pain on his ride side. (R. 188). The ER physician noted that Plaintiff did not lose consciousness as a result of the accident. (R. 188). A CT scan of Plaintiff's cervical spine revealed a right apical pneumothorax. (R. 188). Other tests were negative. (R. 188). By the next morning, the ER physician noted that Plaintiff was doing well, with no active complaints of pain. (R. 188). Later in the day, however, x-rays revealed worsening of Plaintiff's apical pneumothorax. (R. 188). Nevertheless, Plaintiff was adamant that he wanted to leave the hospital. (R. 188). He ended up doing so the next day against the advice of his physician. (R. 189).

More than one year later, Plaintiff presented to Waynesburg Family Medicine where he was examined by Dylan Deatrich, M.D., for complaints of recurring chest pain. (R. 253). Dr. Deatrich diagnosed Plaintiff with chest wall pain, noting that he suspected a contusion. (R. 253). He ordered chest x-rays. (R. 253). He also prescribed Ibuprofen and Vicodin. (R. 253).

Plaintiff followed up on July 27, 2006, with Sherry M. Zimmerman, M.D., to discuss his x-rays, which revealed a potential rib fracture around the 5th and 6th ribs, the area around which Plaintiff felt pain. (R. 251). Dr. Zimmerman reaffirmed Dr. Deatrich's prior diagnosis and kept Plaintiff on the same medications. (R. 251). She also noted that if the pain continued, Plaintiff should undergo a bone scan. (R. 251).

Sometime between July 27, 2006, and August 3, 2006, Plaintiff underwent a bone scan. (R. 268). Upon review of the scan, Dr. Zimmerman concluded that there was "[m]ild increased activity involving the right 5th and 6th rib at the midaxillary line which would correlate with the findings seen on the x-ray films consistent most likely with subacute or old healed fractures." (R. 268). She also noted that "[t]here is a more intense focus of increased activity involving the anterior portion of the right second rib" which "would suggest a more acute fracture." (R. 268).

Later that month, at a follow-up with Dr. Zimmerman, Plaintiff complained of numbness in his left hand and foot, in addition to right-side chest pain. (R. 248). However, Plaintiff denied having pain around his right second rib (i.e., the area where the bone scan showed a possible acute fracture). (R. 248). On August 30, 2006, four days after she last saw Plaintiff, Dr. Zimmerman wrote a letter to an unspecified recipient in which she stated, "[d]ue to this [patient's] medical condition he is unable to work until testing and [treatment] is complete." (R. 260). Plaintiff next saw Dr. Zimmerman on October 26, 2006, and her notes reflect that Plaintiff had experienced a "[r]eversal of the normal cervical curvature" with "[s]pondylosis mostly at C-5 C-6 disc space level." (R. 266).

After that visit, there is a two-year gap in Plaintiff's treatment records. He next presented to Dr. Zimmerman on May 16, 2008, complaining again of lower back pain. (R. 265). X-rays reflected that Plaintiff's lumbar vertical bodies were normal. (R. 265). Furthermore, the disc

spaces were well preserved except for a left-sided pars defect at L4.  (R. 265).

Two months later, Plaintiff returned to Dr. Zimmerman, reiterating his earlier complaint of pain, which especially bothered him when he had to stand for long periods of time.  (R. 241). Dr. Zimmeran noted that the pain was likely secondary to arthritis and musculoskeletal issues. (R. 241).  She ordered Plaintiff to attend physical therapy and prescribed a muscle relaxant.  (R. 241).  Furthermore, she indicated that some of Plaintiff's symptoms were attributable to grief stemming from the recent death of his wife, so she prescribed an anti-depressant, as well.  (R. 241).

On September 3, 2008, Plaintiff reported to Dr. Zimmerman that he stopped attending physical therapy after just one session because he believed it made his pain worse.  (R. 239). Also, Dr. Zimmerman noted that Plaintiff had started to experience hip pain.  (R. 239).  She refilled his medications, sent him to a chiropractor, and ordered x-rays of his hip.  (R. 239).  At Dr. Zimmerman's request, William Castro, M.D., x-rayed of Plaintiff's lateral hip.  (R. 275).  He found "minimal spurring."  (R. 275).  Otherwise, there were no abnormalities found.  (R. 275).

An October 23, 2008, progress note from Dr. Zimmerman indicates that Plaintiff was treated eight times by chiropractor Philip Woods, D.C. (R. 237).   Plaintiff had apparently not improved under Dr. Woods' care, and therefore, he was back to Dr. Zimmerman for re-evaluation.  (R. 237).

At an appointment with Dr. Zimmerman the following week, Plaintiff reiterated that he had not improved with chiropractic care.  (R. 235).  Despite Plaintiff's continued complaints of pain, his x-rays were still unremarkable, but for the L4 pars defect.  (R. 235).  Nonetheless, noting that Plaintiff had "not improved with more conservative treatment," Dr. Zimmerman planned to order an MRI and possibly refer Plaintiff to a pain specialist.  (R. 235).

Plaintiff had an MRI on November 3, 2008, performed by Mark Hilborn, M.D. (R. 273). According to Dr. Hilborn, Plaintiff's lumbar spine was normally aligned. (R. 273). Furthermore, although there were no signs of significant degenerative disc disease, "occasional cavernous hemangiomas are seen scattered through the lumbar spine." (R. 273). Dr. Hilborn concluded that Plaintiff experienced "mild diffuse disc bulging at multiple levels . . . without evidence of any disc protrusions or herniations . . . significant spinal stenosis was not seen in this examination." (R. 273-74).

On February 25, 2009, state agency physician Nghia Van Fran, M.D., completed a physical RFC assessment. (R. 276). Dr. Fran opined that Plaintiff could perform a limited range of light work. (R. 277). Moreover, in Dr. Fran's opinion, Plaintiff was limited to the occasional performance of postural activities (climbing, balancing, stopping, kneeling, crouching, and crawling) but was otherwise unrestricted. (R. 2778-79).

Between November 2008 and November 2010, there is another gap in Plaintiff's treatment history from Waynesburg Family Medicine. (R. 326). He apparently did not seek any treatment during that period because on November 5, 2010, he presented to Dr. Deatrich in order to re-establish care. (R. 326). In addition to his complaints of back pain, Plaintiff reported numbness in his legs to his feet, with similar symptoms in his arms. (R. 326). Plaintiff reported that he was using Tylenol to manage his pain. (R. 326). At the conclusion of the examination, Dr. Deatrich "agreed to complete temporary disability paperwork to help [Plaintiff] with some insurance assistance." (R. 327). Furthermore, he ordered another MRI of Plaintiff's lumbar spine to determine whether Plaintiff's condition had worsened since 2008. (R. 327). Dr. Deatrich indicated that he would determine whether Plaintiff should see a pain management specialist or neurosurgeon after reviewing his MRI. (R. 327).

Plaintiff underwent a consultative examination with Michael Platto, M.D., on November 23, 2010. (R. 286). Dr. Platto noted that Plaintiff was "[a] well-developed, pleasant, cooperative, somewhat dysphoric-appearing white male." (R. 288). He had a normal gait pattern and was able to get on and off the exam table without assistance. (R. 288). Dr. Platto also noted that Plaintiff did not use a cane or other ambulatory assistance device and was able to squat and get back up again while holding onto the exam table. (R. 288). Upon examination, Dr. Platto found full internal and external rotation of both shoulders and full motor strength in both upper and lower extremities. (R. 288). However, "exam of the low back shows patient to have 40 degrees of forward flexion, 5 degrees of extension, which does increase low back pain, 25 degrees of left lateral flexion, and 17 degrees of right lateral flexion. Tenderness to palpation of lumbar spinousprocess and bilateral lumbar paraspinal muscles." (R. 288). Dr. Platto also reviewed the results of Plaintiff's November 3, 2008, MRI, which "showed disk bulging at the L3-L4, L4-L5, L5-S1, but no evidence of HNP or spinal stenosis." (R. 288). Based on his examination, Dr. Platto concluded that Plaintiff was capable of performing light-duty work, with several exertional and non-exertional limitations. (R. 289). He further noted that "[t]he overall prognosis . . . is fair if a job is found within his capacities." (R. 289).

Plaintiff returned to Dr. Deatrich's office on December 7, 2010. (R. 321). Dr. Deatrich noted that the results of the MRI conducted after Plaintiff's last visit were consistent with the results from his 2008 MRI. (R. 321). Plaintiff stated that he was not getting relief from extra-strength Tylenol, so he wanted something else to try to alleviate the pain. (R. 321). Accordingly, Dr. Deatrich prescribed Tramadol, and noted that "depending on how [Plaintiff's] symptoms progress, [I] will determine the next step." (R. 321). After conducting the examination, Dr. Deatrich drafted a letter on behalf of Plaintiff, indicating that he could not complete his

community service resulting from a recent DUI arrest "[d]ue to his current limitations." (R. 336).

At a January 31, 2011, appointment with Dr. Deatrich, Plaintiff complained that his back pain had worsened. (R. 317). He also reported that the Tramadol made him itchy, so he had stopped taking it. (R. 317). Furthermore, he reported that he could not see a pain management specialist as directed, because of an apparent lack of insurance coverage. (R. 317). Dr. Deatrich noted that he "explained to [Plaintiff] that this office will not handle chronic pain management for him. Since his insurance has changed, [I] will refer him back to pain management for evaluation and treatment." (R. 317). Nevertheless, Dr. Deatrich decided to prescribe Baclofen and Vicodin for pain control and ordered Plaintiff to follow-up as needed. (R. 317).

The next month, Plaintiff returned to Dr. Deatrich with complaints of an allergic reaction to his new medication, though he was unsure whether the reaction was caused by the Baclofen or the Vicodin. (R. 314). Plaintiff reported that he had stopped taking both medications because of the reaction. (R. 314). Dr. Deatrich continued Plaintiff on the Vicodin to see if the symptoms would return. (R. 314). If the symptoms returned, Plaintiff was directed to re-start Baclofen, at which time Dr. Deatrich would try something else to manage his pain. (R. 315).

Plaintiff followed-up with Dr. Deatrich on March 9, 2011, to discuss his medications. (R. 311). According to Dr. Deatrich's notes, Plaintiff's physical condition had not changed since his last visit. (R. 312). The side effects had apparently subsided, and Plaintiff was continued on Vicodin, with the dose increased to 1.5 tablets daily. (R. 312). At the conclusion of this appointment, Dr. Deatrich drafted another letter in which he advised that Plaintiff could not complete his community service obligations because of his medical limitations. (R. 335).

On March 28, 2011, Plaintiff met with Dr. Deatrich, at which time he reported that his

pain continued to worsen, despite the increased dosage of Vicodin. (R. 309). He also reported that he was in prison over the prior weekend and some of his Vicodin had allegedly turned up missing. (R. 309). Dr. Deatrich increased Plaintiff's dosage of Vicodin, but he also noted that he was "very concerned about this [patient] and his narcotic use; [I]need to monitor for keeping his [appointment] in July with pain management; if he delays or misses that [appointment], he will promptly stop receiving narcotics from our office." (R. 310).

## B.    Procedural History

Plaintiff protectively filed applications for SSI/DIB on November 25, 2008. An administrative hearing was held on April 22, 2011, in Pittsburgh before Administrative Law Judge James Bukes (the "ALJ"). Plaintiff was represented by counsel and testified at the hearing. Samuel E. Edelmann, an impartial vocational expert ("VE"), also testified.

On May 5, 2011, the ALJ rendered an unfavorable decision to Plaintiff. The ALJ found that Plaintiff had the following severe impairments: "chest wall pain status-post rib fractures, spondylosis of the cervical spine, degenerative disc disease of the lumbar spine, and knee pain." (R. 25). However, the ALJ determined that none of these impairments met or equaled any of the listed impairments. (R. 26-27). He proceeded to conclude that Plaintiff retained the ability to perform a limited range of light work with the following limitations: "He could stand/walk a total of three hours in an 8-hour workday. However, he would need a sit/stand option that would allow him to sit for one hour and stand for one hour alternating throughout the day. In addition, he can engage in all postural activities occasionally." (R. 27). While Plaintiff did not have the residual functional capacity ("RFC") to return to his past relevant work, the ALJ determined, with the aid of the VE's testimony, that Plaintiff retained the ability to perform a significant number of jobs existing in the national economy, namely packer (100,000 jobs existing in the

national economy) and sorter grader (46,000 jobs existing in the national economy). Therefore, the ALJ held that Plaintiff was not "disabled" within the meaning of the Act. (R. 37).

The ALJ's decision became the final decision of the Commissioner on September 15, 2012, when the Appeals Council denied Plaintiff's request for review. (R. 1).

On November 14, 2012, Plaintiff filed his Complaint in this Court seeking judicial review of the ALJ's decision. The parties have filed cross-motions for summary judgment (ECF Nos. 10, 12), with briefs in support (ECF Nos. 11, 13). Plaintiff contends that the ALJ committed five errors in reaching the determination that he is not disabled under the Act, as will be discussed in greater detail below. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence.

## III. **Legal Analysis**

### A. **Standard of Review**

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. § 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g); *see Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). It consists of more than a scintilla of evidence but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is

working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal quotation marks omitted); 42 U.S.C. § 423 (d)(1). This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy," *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job. *See Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at

503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

When a claimant has multiple impairments that may not individually reach the level of severity necessary to qualify a single impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2010); *see also* 42 U.S.C. § 423(d)(2)(C) (providing that "in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

**B.     Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied.*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Plaintiff argues that the ALJ erred (1) by failing to re-contact his treating physicians for clarifications regarding their medical opinions; (2) by failing to request an opinion from Plaintiff's treating physicians regarding his function-by-function limitations;[2] (3) in evaluating the opinion of Dr. Deatrich; (4) in assessing Plaintiff's credibility;

---

2.     Plaintiff has grouped arguments related to the ALJ's alleged failure to recontact his treating physicians and his failure to request an opinion from each physician as to Plaintiff's function-by-function limitations under the same subheading. While there is some overlap between these two arguments, they raise distinct issues: whether recontact is required and whether the record is complete in the absence of a medical source statement from a treating physician. Thus, for purposes of clarity, the Court will address each argument separately.

and (5) in asking an incomplete hypothetical question to the VE. The Commissioner, for her part, argues that the ALJ's decision is supported by substantial evidence. The Court will address each of Plaintiff's arguments *seriatim*.

1.    *Whether the ALJ's failure to recontact Plaintiff's treating physicians constitutes clear error, requiring remand.*

First, Plaintiff contends that the ALJ did not fully develop the record because he failed to recontact two of Plaintiff's treating physicians, Dr. Zimmerman and Dr. Deatrich, to seek clarification regarding their opinions as to the work-preclusive effects of Plaintiff's impairments. The Commissioner does not dispute that the ALJ never recontacted either physician. The Court concludes, however, that the ALJ was under no obligation to do so, and therefore, the alleged failure provides no basis for remanding this case.

An ALJ has an obligation to develop the administrative record, which encompasses a duty, in certain circumstances, to recontact a medical source to obtain additional information from him or her. As applicable at the time when Plaintiff's claim was adjudicated, the Regulations provided that an ALJ must recontact a source when the source's report "contains a conflict or ambiguity that must be resolved," "does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing 20 C.F.R. § 416.912(e)(1) and 20 C.F.R. 404.1512(e)(1)).[3] As the United States Court of Appeals for the Third Circuit has recognized, however, the regulatory language is preceded by an important qualification: the ALJ is required to recontact only when "the evidence we receive from your

---

3.    As of March 26, 2012, the regulations governing an ALJ's duty to recontact a medical source have changed. Under the current regulations, when faced with insufficient evidence to determine disability, an ALJ "may recontact [a] treating physician, psychologist, or other medical source" but may instead seek further evidence from another source, including the claimant himself. *See* 20 C.F.R. § 404.1520b.

treating physician or psychologist or other medical source is *inadequate* for us to determine whether you are disabled." *Id.* (emphasis added); *accord Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability."). The Social Security Ruling on which Plaintiff relies contains that same caveat. *See* SSR 96–5P, 1996 WL 374183, at *2 (July 2, 1996) (explaining that an ALJ must re-contact a treating source only when his "opinions are not clear. . .").

Plaintiff first contends that the ALJ erred by not recontacting Dr. Zimmerman. In his decision, the ALJ acknowledged Dr. Zimmerman's 2006 statement that Plaintiff was "unable to work" but went on to discount it because "[Dr. Zimmerman] never opined that [Plaintiff] was disabled for a continuous 12-month period." (R. 33). Plaintiff claims that since the statement was arguably ambiguous – Dr. Zimmerman never opined "as to how long Plaintiff would be unable to work" – the ALJ should have reached out to her for clarification. Pl.'s Mem. in Supp. of Mot. for Summ. J. 13 (ECF No. 13).

Before addressing Plaintiff's argument, it is important to recognize that the ultimate decision of whether a claimant satisfies "the statutory definition of disability" is reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1). Thus, "a statement by a medical source that [the Plaintiff is] 'disabled' or 'unable to work'" is never entitled to controlling weight. *Id.* Nor is such a statement entitled to "any special significance," *id.* § 404.1527(d)(3), though it still must be considered in the same manner as all of the other opinion evidence in the record, s*ee* SSR 96-2P, 1996 WL 374188, at *4 (July 2, 1996). In view of that, to the extent that the ALJ concluded that Dr. Zimmerman's one-sentence letter regarding Plaintiff's ability to work was unsupported by clinical findings and inconsistent with the other medical evidence of record, he was free to

reject it. *See* 20 C.F.R. § 416.927(c) (describing factors to be considered in determining weight to be given to medical opinion on matters reserved for the Commissioner). It is also worth noting that when Dr. Zimmerman rendered her opinion, she had only treated Plaintiff twice: first on July 27, 2006, and again on August 25, 2006. (R. 248, 251). Therefore, contrary to Plaintiff's assertions, at this time Dr. Zimmerman's opinion could not have been based on a long history of treatment and a longitudinal picture of Plaintiff's impairments. That alone further diminished the amount of weight to which the statement was entitled.

Turning now to the precise question raised by Plaintiff: before deciding to discount Dr. Zimmerman's opinion, was the ALJ required to recontact her for clarification about the duration of Plaintiff's purported disability? The Court recognizes that there is some support for Plaintiff's position in the case law from District Courts within the Third Circuit. *See, e.g.*, *Brown v. Astrue*, 590 F. Supp. 2d 669, 675 (D. Del. 2008) ("To the extent that the A.L.J. required further information regarding whether [the opinion that plaintiff was 'unable to work at present'] still applied to plaintiff's condition, the A.L.J. should have contacted her treating physician to clarify and further develop the record."). However, *Brown* cannot be read too broadly, as the weight of authority holds that there is no *per se* rule requiring an ALJ to recontact a treating source merely because the source opined that the claimant was, for example, "temporarily disabled" or "unable to work at present." *See, e.g.*, *Williams v. Astrue*, No. 10–CV–499S, 2012 WL 1114052, at *4 (W.D.N.Y. March 30, 2012); *Dillon v. Astrue*, No. TMD 08–2597TMD, 2011 WL 337334, at *3 (D. Md. Jan. 31, 2011); *Rodriguez v. Barnhart*, No. 03 CV 4744(RLC), 2006 WL 870937, at *2 n.4 (S.D.N.Y. Apr. 5, 2006). The critical question remains whether there is enough evidence in the record to permit an ALJ to reach an informed decision. *See Dillon*, 2011 WL 337334, at *3 (concluding that ALJ "was not under a duty to recontact" two of plaintiff's treating physicians

"because they opined [he] was unable to work" since "[t]here was sufficient evidence in the record to determine disability"); *Rodriguez*, 2006 WL 870937, at *2 n.4 (concluding that duty to recontact physician was not triggered by physician's statement that "plaintiff was 'unable to work at present'" because there was "a complete record with ample evidence to support the ALJ's conclusion").

In this case, that threshold has been met. The record is more than adequate, as there were several years' worth of medical records developed after Dr. Zimmerman's statement in November 2006, including the RFC assessments from the state agency physician and the consultative examiner, both of which supported the ALJ's conclusion. Notably, from 2006 to 2011, objective and diagnostic testing never revealed significant abnormalities. Consistent with those findings, Plaintiff's impairments were treated fairly conservatively with pain medications, limited physical therapy, and chiropractic sessions. Furthermore, there were two significant gaps in Plaintiff's medical history, during which time he apparently did not seek any treatment. All of this evidence provided the ALJ with sufficient evidence upon which to base his decision.

For the same reason, Plaintiff's argument that the ALJ should have recontacted Dr. Deatrich must also be rejected. Although the ALJ partially incorporated the postural limitations described by Dr. Deatrich into his RFC, he determined that Dr. Deatrich's opinions were not entitled to controlling weight because they were conclusory.[4] The ALJ was under no obligation to recontact Dr. Deatrich simply because he rejected his opinion and found it unsubstantiated by the record. *See White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001) ("It is the inadequacy

---

4.    Insofar as Plaintiff contends that the ALJ should have accorded more weight to the fact that Dr. Deatrich agreed to complete temporary disability forms for Plaintiff, he is mistaken. *See Smith v. Astrue*, No. Civ.A. 11–164J, 2012 WL 1449208, at *3 n.2 (W.D. Pa. Apr. 25, 2012) ("Whether plaintiff was considered to be disabled for purposes of receiving state welfare benefits is irrelevant because another agency's determination regarding disability is not binding on the Commissioner of Social Security.").

of the record, rather than the rejection of the treating physician's opinion, that triggers the duty to recontact that physician.").

In sum, the ALJ did not err by failing to recontact either Dr. Zimmerman or Dr. Deatrich. The record was adequate to support an informed decision, even without obtaining further information from these two physicians.

2. *Whether the ALJ erred by not obtaining medical source statements from Dr. Zimmerman and Dr. Deatrich?*

As noted *supra*, Plaintiff has in actuality made two separate arguments with respect to the ALJ's alleged failure to recontact Plaintiff's two treating physicians, though he blended the arguments together in one section of his brief. As the Court understands it, Plaintiff's second argument focuses on the ALJ's obligation to request statements describing a claimant's function-by-function limitations (i.e., "medical source statements") from a claimant's treating sources.

The Regulations provide a good starting point for a discussion of Plaintiff's argument. Under the Regulations, a medical report from a treating physician should include "a statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings on the factors under paragraphs (b)(1) through (b)(5) of this section (except in statutory blindness claims)." 20 C.F.R. § 416.913(b)(6). The Regulations go on to state: "[a]lthough we will request a medical source statement about what you can still do despite your impairment(s), *the lack of the medical source statement will not make the report incomplete*." *Id.* (emphasis added). Accordingly, as the Third Circuit Court of Appeals has held, the "lack of a MSS specifically does not render a medical report incomplete," and in turn does not mandate a remand. *Moser v. Barnhart*, 89 Fed. Appx. 347, 348 (3d Cir. 2004).

In *Moser*, however, our appellate court did not expressly consider whether an ALJ has a duty to *request* medical source statements from a claimant's treating sources. The afore-cited

regulation could be read to suggest that such a duty exists. *See* 20 C.F.R. § 416.913(b)(6) (stating that "we *will request* a medical source statement") (emphasis added). The Second Circuit Court of Appeals recently addressed this question in an unpublished decision, and this Court finds its rationale persuasive. *See Tankinski v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 33 (2d Cir. 2013). While the *Tankinski* court acknowledged that 20 C.F.R. § 416.913(b)(6) "seems to impose on the ALJ a duty to solicit such medical opinions," the court nevertheless held that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.*

Such is the case here. As previously explained, the record provided the ALJ with a sufficient basis upon which to render an informed decision. While it did not contain medical source statements from Plaintiff's two treating physicians, it did contain such statements from the state agency physician and the consultative examiner, along with the records from Plaintiff's fairly limited treatment at Waynesburg Family Medicine from 2006 to 2011. Therefore, it "would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity." *Id.* at 34 (citations omitted).

3. *Whether the ALJ erred in evaluating the opinion of Dr. Deatrich with respect to Plaintiff's ability to climb?*

Next, Plaintiff argues that the ALJ improperly rejected Dr. Deatrich's opinion regarding Plaintiff's ability to climb. He argues that this alleged failure resulted in a flawed RFC finding because Dr. Deatrich's view of Plaintiff's impairment was more restrictive than that which was reflected in the RFC.

It is well settled that an ALJ must accord a treating source's opinions "great weight, especially when [they] reflect expert judgment based on a continuing observation of the patient's

condition over a prolonged period of time." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987).   Indeed, a treating physician's opinion must be deemed "controlling" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).   Consequently, an ALJ may reject the opinion of a physician only if it is contrary to other medical evidence contained in the record, *see, e.g.*, *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988), or if it is insufficiently supported by clinical data, *see, e.g.*, *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d. Cir.1985). Moreover, even if a treating source's opinion is not found to be controlling, "it is still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." SSR 96-2P, 1996 WL 374188, at *4.   These factors include the treatment relationship, length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. 20 C.F.R. § § 404.1527(c)(2)-(6).

Further, when the ALJ's decision is not "fully favorable to the claimant," as is the case here, the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2P, 1996 WL 374188, at *5.   Our appellate court "has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). "[I]f the ALJ has not adequately explained his or her treatment of obviously probative evidence, the court cannot say whether substantial evidence supports an ALJ's conclusion." *Tomassi v. Colvin*, No.

2:12–cv–01354, 2013 WL 5308021, at *14 (W.D. Pa. Sept. 20, 2013) (citation omitted).

In this case, Dr. Deatrich's opinion as to Plaintiff's ability to climb was inconsistent with the RFC assessments completed by state agency physician, Dr. Van Fran, and consultative examiner, Dr. Platto. (R. 276-82; 286-95). Both Dr. Van Fran and Dr. Platto opined that Plaintiff could climb "occasionally." (R. 278, 291). Meanwhile, Dr. Deatrich opined in his November 22, 2010, letter that Plaintiff was medically unable to climb a bunk bed ladder. (R. 337). Because Dr. Deatrich's opinion was inconsistent with the other evidence of record, it may not have been entitled to controlling weight. However, before rejecting Dr. Deatrich's opinion or deciding to accord it less weight, the ALJ should have at minimum noted the inconsistency and provided some form of an explanation for his decision to incorporate Dr. Van Fran's and Dr. Platto's opinions over Dr. Deatrich's. His failure to do so constituted an error.

With that said, the Court nevertheless finds that this error does not warrant a remand. The Commissioner has instructed that "[n]onexertional impairments may or may not significantly narrow the range of work a person can do." SSR 83-14, 1983 WL 31254, at *1 (1983). In fact, there are "relatively few jobs in the national economy" that require the use of ladders or scaffolding, and therefore the degree to which a claimant can climb has little to no effect on the unskilled occupational base. *Id.* at *2-5. In this case, while the ALJ did not incorporate Dr. Deatrich's total restriction on climbing into his RFC, he did limit Plaintiff to "occasional" climbing (from very little up to 1/3 of an eight-hour workday). This minor difference would not have significantly eroded the occupational basis. That is, the VE's testimony in response to the hypothetical posed by the ALJ would have been substantially the same. Thus, the ALJ's error was harmless, not requiring remand. *See, e.g.*, *Dice v. Comm'r of Soc. Sec.*, No. 12–cv–11784, 2013 WL 2155528, at *7 (E.D. Mich. Apr. 19, 2013) (concluding

that ALJ's failure to incorporate climbing limitation into RFC was harmless error because the limitation would not effect "the occupational base to any great degree"); *Edson v. Astrue*, No. 2:07-cv-00042, 2008 WL 2596567, at *13 (W.D. Va. June 26, 2008) (finding harmless error where ALJ failed to explicitly reference postural limitations, including climbing, in his RFC because such limitations did not affect claimant's "ability to perform the full range of light work"); *Harrington v. Comm'r of Soc. Sec.*, No. 07cv1330 JM(RBB), 2008 WL 4492614, at *13 (S.D. Cal. Sept. 29, 2008) (finding harmless error when ALJ failed to include functional limitations in his hypothetical question since they would "have a negligible effect on a person's ability to perform unskilled light work").

4.  *Whether the ALJ erred in assessing Plaintiff's credibility?*

Making credibility findings is within the purview of the ALJ. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). An ALJ may reject the claimant's subjective testimony if he does not find it credible but he must explain his reasons for doing so. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The Court will defer to an ALJ's credibility findings, so long as a sufficient explanation is provided. *Reefer*, 326 F.3d at 380.

Plaintiff argues that the ALJ failed to consider his testimony describing his limitations in daily activities. However, a thorough review of the ALJ's decision reveals that he did no such thing. Instead, the ALJ expressly considered all of the relevant evidence in reaching his credibility determination, including the daily activities Plaintiff claims were omitted from the analysis. (R. 28). After examining Plaintiff's statements about his daily activities, the ALJ concluded that Plaintiff's musculoskeletal impairments could be expected to cause some of the described symptoms, but were "greater than demonstrated by the objective medical findings and treatment records." (R. 28). The Court finds no fault with that determination, as the ALJ amply

set forth the basis for his decision.

Plaintiff also contends that the ALJ mischaracterized his noncompliance with his physician's medical recommendations. Again, the Court finds that the ALJ's determination in this regard was not in error.

An ALJ is permitted to consider a claimant's treatment history in assessing credibility. *See* 20 C.F.R. § 416.929(c)(3)(v). Likewise, "[a]n ALJ may treat a claimant's noncompliance with a treatment plan as a factor" that adversely affects the claimant's credibility. *Smith v. Astrue*, 2013 WL 3424086, at *15 n.17, --- F. Supp. 2d. --- (D. Del. July 5, 2013) (citation omitted); *see also* SSR 96-7P, 1996 WL 374186, at *7 (July 2, 1996) (explaining that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"). Before making an adverse credibility determination based upon a claimant's purported non-compliance with medical recommendations, the ALJ must "consider[] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.* However, "the operative word in SSR 96–7P is 'consider[].' In arriving at a credibility determination, the ALJ need only *consider* explanations provided by the claimant. The ALJ need not consider and accept as conclusive the claimant's explanations." *Clough v. Astrue*, No. 1:11–CV–00082–BSJ, 2012 WL 2224197, at *9 (D. Utah June 14, 2012) (emphasis in original).

Here, the ALJ found that Plaintiff was noncompliant with his physician's recommendations in that he only attended one physical therapy session and did not take his medications as prescribed. Before doing so, however, the ALJ explicitly acknowledged that

Plaintiff ceased attending therapy because it allegedly "made the pain worse," but the ALJ did not find that to be a sufficient justification. (R. 35). With respect to Plaintiff's use of his prescribed medications, the ALJ considered the apparent side effects allegedly experienced by Plaintiff, but found that "[Plaintiff's] subjective reports of allergic or adverse reactions . . . are not confirmed by his treating medical sources." (R. 35). Thus, because he considered Plaintiff's explanations and the other evidence of record which could reasonably explain Plaintiff's noncompliance with his physician's orders, the ALJ complied with the requirements of SSR 96-7P. That he chose not to accept those explanations is immaterial, as he was not required to do so. *See Clough*, 2012 WL 2224197, at *9.

Assuming that the ALJ's treatment of Plaintiff's noncompliance with medical orders was improper, the ALJ gave several other reasons for his credibility finding, each of which was supported by substantial evidence. In addition to his discussion about the lack of objective medical evidence supporting Plaintiff's subjective complaints, the ALJ noted that Plaintiff made inconsistent statements at various points in the record. (R. 35). For example, Plaintiff reported that he suffered head trauma to Dr. Platto even though none of the other medical records reflect any complaints about head trauma. He also told Dr. Platto that he attended chiropractic therapy for three-to-six months, whereas he actually attended only eight sessions over a three-week span. Furthermore, in assessing Plaintiff's credibility, the ALJ permissibly considered Dr. Deatrich's statement that he was "very concerned about [Plaintiff] and his narcotic use." (R. 35). *See Greiner v. Colvin*, No. 12–1433, 2013 WL 4041964, at *7 (W.D. Pa. Aug. 8, 2013) (citation omitted) (explaining that ALJ may consider evidence of drug-seeking behavior in evaluating a claimant's credibility). Because the ALJ painted a very clear picture about why Plaintiff's testimony was not credible − only a small part of which related to his noncompliance with

medical directives – any alleged error was harmless.

        5.     *Whether the ALJ asked the VE an incomplete hypothetical question?*

Lastly, Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the hypothetical question posed to the VE failed to account for all of Plaintiff's impairments. Because the Court has already rejected Plaintiff's other contentions, the Court need not consider this argument at any length. It suffices to say that the hypothetical appropriately incorporated all of the impairments supported by the objective medical evidence. Moreover, insofar as the minor difference between a "no climbing" limitation and "occasional climbing" limitation would not have affected the VE's response to the hypothetical question, *see supra* Section "III(B)(3)", there is no basis for remanding the case to enable the ALJ to pose a different question.

## IV.    <u>Conclusion</u>

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not "disabled" within the meaning of the Act.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

                McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES A. TOLAND**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 12-cv- 01663 |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 25th day of November 2013, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.  The Motion for Summary Judgment (ECF No. 10) filed by Carolyn W. Colvin,

    Acting Commissioner of Social Security is **GRANTED**;

2.  The Motion for Summary Judgment (ECF No. 12) filed by Plaintiff, Charles

    Toland, is **DENIED**; and

3.  The Clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:   **Karen S. Southwick, Esq.**
      Email: ksouthwick@windisability.com
      **Christy Wiegand, Esq.**
      Email: christy.wiegand@usdoj.gov

      Via CM/ECF